### PURMORT v PURMORT

Ohio Common Pleas, Van Wert Co

Decided May 18, 1933

Hoke & Wright, Van Wert, for plaintiff.
Hedges, Hoover & Tingley, Columbus, for defendant.

OVERMYER, J, Sandusky County,
sitting by assignment.

## OPINION

By OVERMYER, J.

The court has indicated he is ready to decide this case. If I were resident judge here, and had the time, I would probably take a day or two to write an opinion; I usually do that at home when I have time, because it is always more satisfactory for a court to have the privacy of his office to put on paper what his views are. But I have more work to do at home tomorrow. I know if I take this case home I will not get to it for some considerable time, and I feel that after the hearing, when the matters are all fresh in the mind of the court, and he has not been distracted by other matters like he would be at home, there is never a better time to render his decision, if he is ready to render it, than at the close of the hearing.

I was sent over here by the Chief Justice to hear this case, and I knew none of the parties; knew none of the attorneys, I do not think I had ever met any of the attorneys in this case on either side heretofore. I not only had never met either of the parties in the law suit, but I had never even heard of them.

The day I was here a few weeks ago, on preliminary hearing, the whole story was, of course, new, entirely strange to me; I never heard of it; and at that time I refused to make any orders which might place the court in an embarrassing position if he came to hear the case on its merits. I learned very early in that hearing one of the principal contentions in this case is the matter of this contract, and I felt at that time if I made any order such as was asked for then, I might be placed in a position from which I might have to recede when it came to final hearing, so I made no order at that time, because I found that the parties had entered into an agreement in writing and the court, of course, could not pass on that agreement until he heard all about it, so I refused to make any order that might appear to be a setting aside of that agreement between the parties. Then I came here Monday morning when the case was set for hearing and the court has now devoted four days to the hearing. The court was somewhat liberal in permitting testimony to be entered on both sides. As I said at the outset these divorce cases especially are cases where a court never, never gets the whole story. Even in contested cases the court never gets the whole story.

I think the laws of the state of Ohio in divorce cases, and the laws generally in this country, vest a good deal of discretion in the trial judge who hears the case. It must necessarily be so, because of the very nature of the marriage relations, things that enter into it and impressions that arise. We all know the public policy towards divorce, and I hope that the day will also come when there will be a good deal more attention paid to marriage than there is today, both by the State Legislature and otherwise.

Now, somebody made a very trite remark who said "If you want me to believe your story you must tell a story I can believe." The picture that was painted to this court, both at the preliminary hearing and upon statements, and by the defendant in the course of her testimony was a story, in substance, that she was brought here from Metropolitan New York to the wild and wooly precincts of VanWert, wholly unsophisticated, ten or eleven years; that she was neglected; that her husband was devoted to his business and paid no attention to her; that she was required to stay in her home and spend her time as she could; she never got to go anywhere; he did not take her places, and then when he tired of her he dragged her up to a lawyer's office, and her story is that, under pressure and by connivance and by collusion, they took this unsophisticated girl, who had never

been anywhere, and made her sign a contract which she never was· allowed to read, and which they never read to her. Now, that is her story, and that is the story and the picture that was drawn to this court when I came here to hear the case, and of course claiming that by those methods and this inducement she was required to sign a contract·.which is wholly inequitable and unfair to her, and does not provide her with such sums as she is entitled to out of her husband's estate.

What are the facts as disclosed by the evidence? The first thing the court naturally felt when he heard the opening statements, and when I was here a few weeks ago, was that the evidence would disclose that this plaintiff was worth much more than twenty thousand dollars. When you attack a contract of that kind we expect, of course, those who attack it will show that she was grossly abused in the matter of the amount which she was to receive. That would be about the only thing I could expect or imagine would be cause for attacking a contract of this kind, that she was taken advantage of and signed away her rights to money and property that belonged to her. If that is not so, what is the use of attacking the contract?· Does the proof show in this case that the plaintiff is worth any more than the basis upon which that settlement was made? If there is any such evidence I have not heard it. Some little dispute about some items. You take, especially, the furniture. She claims it is worth six hundred dollars; he claims it is worth two or three thousand dollars. You take the question of the salaries from the various companies, insurance and pension deductions. I expected, when I came here to hear this case, the evidence would show, at least to such an extent the court might even have to be in doubt about it, that this man had property and income greatly in excess of the figures used in this contract. But there is no such evidence in the case. Taking the evidence offered on that subject in its most favorable light, and giving it every bit of credibility to which it is entitled, we could not find that this plaintiff is worth more than five hundred, or a thousand dollars more, probably, than the values taken at the time this contract was made. The evidence discloses that the figures that they finally arrived at was around twenty thousand dollars, net. The contract provides she is to get half of that. In addition to that the testimony is undisputed that he brought up the two months payments at that time, she claimed he was in arrears; he paid that, and that

she got the furniture, whatever the value of it is, and the court must find that at the time this contract was made this plaintiff was not worth much more, if any, than twenty thousand dollars, net.

Now, the ground upon which the contract was attacked was the question of collusion and connivance, duress and fraud. I made an examination yesterday, after we adjourned, of the authorities on that subject here especially well collected in the second A.L.R. page 708.

I do not consider it worth the time to make any long discussion about the facts as shown by the evidence surrounding the making of this contract. If I were writing an opinion I would probably put something on paper about it, but the parties are interested, of course, in the conclusions of the court and not, probably, the reasons for reaching them.

My conclusion, arrived at without any hesitation, after seeing all these witnesses and hearing their testimony, is that there is not any collusion about the making of this contract. This defendant testified that she consulted her attorney in Columbus, who appeared here on · the stand, and the court has every reason to believe he is a credible and reputable member of the Columbus Bar. She says that she wanted some counsel from a man of her religious faith, and eventually she went to a lawyer in a neighboring town here who is of her religious faith, and he was her attorney selected by her for particular reasons and especially because he was one of her religious faith, and he represented her at the time of making this contract. Now from his appearance on the stand in this case, and his testimony, and from the position which he holds in this community, and the fact that, outside of this contract, there has not been a word of testimony discrediting him as a man and as a lawyer, this court must find that the attorney who represented her at the time of the making of this contract is an honorable, reputable member of the Bar of an adjoining county, and that he would not stoop to unethical practice in this matter for one of his own religious faith, and from the court's observation of him he would not do that in any case and did not do that in this case.

On the other hand, the court has had an opportunity to ·observe counsel for the plaintiff here in court and when he took the stand. He has been a. resident of this community and practiced law here for forty years or more, I believe he said. I have had an opportunity to observe him and

hear his story about this entire matter, and the court must believe that counsel for the plaintiff would be above the practices which are charged against him in her cross petition, and that they both would be above the practices which she charges them with in her testimony.

The court is inevitably led to the conclusion that she is entirely mistaken in that feature of her story. Mr. Kloeb, now the Congressman from this district, a member of her own religious faith, and Mr. Hoke, who has practiced at the Bar for forty years,—the court cannot take her story as against the story of those two men as to what happened in this two days conference on this contract. The evidence does not support the claim she makes as to. her physical condition during those two days in which she claimed she was so mentally distressed and ready to collapse, and all that, and that she did not know what she was doing. The same witness who testified to that is the same witness who says she never read it,—she never read it; they put the pen in her hand and said "Now you sign it."

If you want the court to believe a story you must tell a story the court can believe, and I cannot believe that story.

The question was raised at the outset about the language used in that contract, and that has given the court some little concern, but reading it in the light of the decisions in this A.L.R., to which I have referred, reading it in the light of the testimony in the case on both sides, I feel that the reference in that one paragraph has more to do with the time when the nine thousand dollars shall be paid than it has with anything else. It may be that more explicit language might have been used in this contract. It may depend perhaps on the person's point of view of what you want to make it; but that it might bear a construction that it was made in contemplation of and with the purpose of securing a divorce, I can not read into it. But after seeing and observing the men who drew that contract, representing both parties, I cannot believe that they had any such purpose in drawing it; in other words, that there is no evidence of procurement or collusion or connivance of fraud. I think the language they used there has more particular reference to the time when the remaining nine thousand dollars shall be paid of the ten thousand which the contract carries.

In my practice I have had some experience in drawing up separation contracts; have not had many on the bench; they are not a common thing in the average county, do not happen very often, but the court is constrained to believe that the circumstances surrounding the making of this contract had more attention, were given more time and were more fully discussed by both parties than they usually are in matters of this kind. It seems to me that the whole transaction was quite open and above board, and the parties were both represented by counsel at the time, counsel which the court must find are reputable lawyers in their respective communities. So I cannot find that the contract has language in it that shows on its face that it has evidence of collusion or connivance or anything of that kind. And the court, in view of these authorities,—I will not take the time to read here what the A.L.R. says,—and there are plenty of authorities cited here which approach this particular contract near enough. to be of assistance to the court,—I do not believe that this contract is different from the average, usual, ordinary contract that is made in matters of this kind. Of course, some courts are confronted with these property settlements where one of the parties did not have counsel. That is a different proposition.

So, the court find that the contract is free from fraud; that it was made with both parties represented by competent and reliable counsel and the court does not find it tainted with fraud.

Now, that is one part of the picture I spoke of that was painted to the court which the evidence does not support.

There is another statement which I made at the outset, that the picture was painted to the court that this defendant came here, an unsophisticated girl, neglected and was not paid any attention by the plaintiff. But that, is not supported by the evidence; on the contrary the evidence discloses, undisputedly, that her ten years of married life have been sprinkled quite frequently, entirely too frequently, of course, with golf, bridge, highball drinking and cigarette smoking; instead of being neglected and allowed to stay at home alone, she has traveled considerably more than 1 have. The evidence discloses that she has been to New York a number of times, Los Angeles, Denver, Canada, White Sulphur Springs, Lexington, Europe, and numerous trips, which are not denied, to surrounding towns for Sunday dinners and things of that sort. Her picture again falls in that respect. On the contrary it shows that she had an allowance in the last few years of two hundred dollars a month to

spend pretty much as she pleased. She had a husband who, she says, worked too hard. He had ambitions; he worked himself up, according to the testimony, from an average clerk, to an income of around eighteen thousand dollars a year. Her complaint was that he devoted so much time to his business that he neglected her. But as I say, the evidence does not support that contention. I do not know how he could have arrived at the position he holds in the business world if he had not paid attention to his business, if he had not been ambitious, and of course we all know a man who must meet men, like he must meet them, in various insurance companies, sometimes entertain them and all that, must, of course, often times be away from home, sometimes over night, sometimes during the lunch hour. Those things cannot be avoided. But this can be said, in spite of all his highball drinking, that he made it pay,—he made his work pay; whatever else may be said about it, he made it pay, he worked himself up to a position where he was able to give her two hundred dollars a month, where he was able to take her where she wished, where he was able to give her money to go to all parts of the country and to Europe. That is something she cannot very well complain about. I do not know where the defendant would expect to get the money with which to play bridge and go to dances, play golf and go to New York, go to Europe and go to Los Angeles if it didn't come out of her husband's earnings. No evidence before the court that she used her private funds from home, or anything of that kind to do any of this. On the evidence I think the court is warranted in finding this money all came from her husband and his earnings. So this picture that the defendant undertook to paint to the court has failed in more than one respect.

Now when we approach the subject of divorce the court has also examined some authorities during the evening. Examined what Ohio Jurisprudence has to say on it; **14th Ohio Jurisprudence, page 375 et seq.,** and also under the subject of "Condonement," on the theory that counsel for the defense contend that even though there might have been grounds for divorce they had been condoned by the plaintiff resuming marital relations with the defendant.

As I said a while ago, most everybody understands that divorce cases are a little different from others, and there is some discretion vested in the trial courts in court cases. We all know that in Ohio there are certain statutory grounds for divorce. We

also all know that one seeking a divorce must allege and prove at least one ground for divorce. In this case the plaintiff alleged the grounds of extreme cruelty and gross neglect of duty. Before he is entitled to divorce, (and she is not asking for any,) of course, his proof must sustain one or the other of two charges which he has in the petition.

Various trial courts have various views on divorce cases, and sometimes approach the subject of divorce from different angles. They are among the most difficult cases the courts have to contend with. But I cannot shirk my duty and must confine my decision in any divorce case to the law of Ohio and the authorities of Ohio.

The grounds which the plaintiff has undertaken to prove would probably consist more of a continued attitude of opposition and conduct on the part of the defendant towards him in interfering with his business, and nagging and picking on him to such an extent as to cause, during the course of years, a continued aggravation to him, which reached a climax this last fall, which caused him to believe that he could no longer tolerate the marriage relations with her. That is about the story, as I get it, that the plaintiff presents to this court. There are some particular instances, of course,—testified to on the part of the defendant, and the plaintiff himself has not denied under oath that he sometimes lost his temper, and probably did. So that these particular instances which were testified to, and from which the plaintiff undertook to paint to this court a picture of a series of conduct and actions on her part which made the marriage life no longer tolerable to him is about the only thing I know that has been offered to the court. There are, of course, some instances of particular acts of extreme cruelty about which he testified. There are some about which she testified. Of course, some of them were supported; some of them were contradicted by other witnesses. So that leaves the court in a position where he must believe those things which he finds worthy of belief and reject those things which he finds unworthy. As I said at the beginning, the court never knows the whole story. He can only decide it from the evidence that is brought before him. But the court can also use his eyes and ears, his common sense, if he has any, and his experience in life as a man, and a lawyer of considerable experience and about eight years on the bench. So I call all those things to my aid in deciding this case.

Now it appears from the decisions that a

course of conduct such as I have referred to may constitute a ground for divorce. **Ohio Jurisprudence, Volume 14, page 388,** in the text, says, "That extreme cruelty is not confined to acts of physical violence." The author says this: "Furthermore, while the earlier doctrine with respect to the nature and character of the acts required to constitute 'extreme cruelty' was that there must be either personal violence, or the reasonable apprehension thereof, or a systematic course of ill treatment affecting the health and endangering the life of the party against whom it is directed, the tendency of the more recent decisions appears to be to give the term a somewhat broader scope, so as to include acts and conduct the effect of which is to render the marital relation intolerable, although they do not directly affect the health of the party against whom they are directed." Cases are cited in support of the text.

Then on page 394 they cite an Ohio decision in which the author says this: "It has been said that a fixed attitude of opposition on the part of a husband or wife toward the other, leading to constant bickerings and recrimination over a long period of time, may constitute the offense of gross neglect of duty." (**Stark v Stark, 28 O.N.P. (N.S.) 36**).

If I had the time and opportunity to discuss the evidence in an orderly form I would do so.

The court feels, under the evidence in this case, there is sufficient ground to grant the plaintiff a divorce on the grounds of extreme cruelty and gross neglect of duty, and I base it somewhat upon these authorities here, and somewhat upon what the court feels the evidence particularly disclosed in this case, on which, of course, the case must be decided. Usually in divorce cases where extreme cruelty and gross neglect, or either one of them are alleged, you usually find different facts from those which are presented to the court in this case. But the court sat here three or four days and observed these parties and found that the defendant, instead of being the unsophisticated woman she pretended to be, is a very clever woman, very intelligent woman, a much traveled woman. A little too clever on cross examination, in fact, for her own good. The plaintiff himself is probably what we call one of our modern young business men, drinking too much occasionally, and so did she, and yet what have they brought against this plaintiff as to his character, his business ability, his ability to make money, his willingness to take her out and buy her things, give her

trips, give her money to spend? What is that picture? Even though he admitted taking highballs, perhaps frequently, too much occasionally, is the court justified on that account to refuse him consideration which the court would give him if that were not present? I fear that the courts, if they would decide the cases on that, would find ourselves in difficulty a great deal. It does not do this court any good, or anybody, to try to deliver any lecture to anybody on the question of drinking, and highball parties, and things of that kind. That is all water over the dam in this case. The court was very sorry to have to listen to it, of course, because it may be much of that is responsible, in many instances such as this, in marriage relations going on the rocks.

Fortunately for the court and all parties, and unfortunately for the husband and wife, here involved, there are no children in this case requiring the court to make any order as to them. It is undoubtedly true if more time had been devoted in the family to having a family and rearing children and less to drinking highballs and things of that kind, the marriage relations might have continued to run along smoothly. I do not know anything about that. There are no children, and since this marriage cruise has gone on the rocks it is a good thing there are none. If the court were to set aside this contract and make an order, and the only way I can make an order, of course, is by granting the divorce, but if I were to set aside this contract I could not, under the evidence in this case, give her one cent more than the contract gave her, because the evidence does not show he is worth a cent more than that, and therefore, as I have already indicated, I will grant a divorce to plaintiff on the grounds alleged in the petition; I will approve the contract the parties entered into on the question of property settlement, and the plaintiff may pay the costs. Exceptions.